AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>KENNETH LEE HILBRANT, JR.,<br><br>Defendant. | FILED<br>CLERK, U.S. DISTRICT COURT<br>10/16/2020<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ____dj____ DEPUTY<br><br>Case No. **20-MJ-5025** |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 9, 2020 in the county of Santa Barbara in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Adam Brown
*Complainant's signature*

Adam Brown, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: October 16, 2020

*Judge's signature*

City and state: Santa Barbara, California

Hon. Louise A. LaMothe, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Adam Brown, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is submitted in support of a criminal complaint and arrest warrant for Kenneth Lee Hilbrant, Jr. ("HILBRANT") for violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

2. This affidavit is also made in support of an application for a warrant to search the following digital devices which were seized on September 9, 2020, and are currently in the custody of the Federal Bureau of Investigation ("FBI") in Santa Maria, California, as described more fully in Attachment A:

    a. An LG cellular telephone with an IMEI number of 352375110708153 ("SUBJECT DEVICE 1");

    b. A Samsung cellular telephone with an IMEI number of 357855101145940 ("SUBJECT DEVICE 2");

    c. A Samsung cellular telephone with a suspected IMEI number of 355671105137904 ("SUBJECT DEVICE 3");[1]

    d. A Samsung cellular telephone with a suspected IMEI number of 355369103077723 ("SUBJECT DEVICE 4"); and

---

[1] The IMEI numbers on some phones have been worn down and are difficult to read based on their size and the condition of the phones. As a result, I have tried to note the IMEI numbers to the best of my ability by inspecting the exterior of the phone.

e.  An LG Stylo 4 cellular telephone with a suspected IMEI number of 352439103596254 ("SUBJECT DEVICE 5") (collectively, the "SUBJECT DEVICES").

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Conspiracy, Distribution, and Possession with Intent to Distribute Controlled Substances), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from various law enforcement personnel, and police incident reports.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent with the FBI and have been employed as such since January 2018.  I am currently assigned to the Los Angeles Field Office, Santa Maria Resident Agency, Central Coast Safe Streets Task Force ("CCSSTF").  CCSSTF is a Task Force comprised of agents and officers from federal, state, and local agencies, who are assigned to investigate gang-related crimes and large-scale drug trafficking matters.  I have

participated in investigations involving violations of drug laws and participated in the execution of numerous arrest and search warrants.  I have also participated in the interviews of defendants, informants, and witnesses who had personal knowledge of drug trafficking methods.  Additionally, I have conducted surveillance and participated in investigations using Confidential Human Sources ("CHS") to make controlled purchases of drugs from drug traffickers and members of criminal street gangs.  Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by drug traffickers to manufacture drugs, smuggle and safeguard drugs, distribute drugs, and collect and launder proceeds related to the sale of drugs.  I am familiar with the methods employed by gang members to thwart detection by law enforcement, including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

### III.  **SUMMARY OF PROBABLE CAUSE**

6.   On September 9, 2020, after receiving a tip that HILBRANT was selling drugs from a local Radisson hotel, Santa Maria Police Department ("SMPD") officers conducted surveillance at the hotel to locate and arrest HILBRANT.  At the time of the surveillance, SMPD was aware that HILBRANT had a warrant for his arrest, in addition to being on probation with search terms.

7.   At approximately 8:00 p.m., SMPD officers on surveillance positively identified HILBRANT as he was arriving

at the Radisson hotel. Officers approached him and arrested him on his outstanding warrant. During the search incident to his arrest, officers found a plastic bag containing approximately one pound of methamphetamine in a "Jack in the Box" restaurant bag that HILBRANT was carrying.

8. SMPD officers subsequently searched HILBRANT's car and a Radisson hotel room, which was registered in HILBRANT's name. Inside his hotel room, SMPD officers seized additional drug-related paraphernalia, including four additional bags, containing approximately one ounce of suspected methamphetamine each, and a fifth bag, containing less than an ounce of methamphetamine.

## IV. STATEMENT OF PROBABLE CAUSE

9. Based on my conversations with, reports written by, and photographs taken by law enforcement officers, and my own knowledge, training, and experience, I am aware of the following:

### A. SMPD Receives a Tip From a CHS that HILBRANT is Selling Drugs at a Local Hotel

10. Approximately one week prior to September 9, 2020, SMPD officers received a tip from a CHS[2] that HILBRANT was selling drugs from a local Radisson hotel, located at 3455

---

[2] The CHS is receiving compensation to work with law enforcement. The CHS has a number of prior misdemeanor convictions, including use/under influence of a controlled substance in 2009; domestic battery in 2009 and 2011; false identification to peace officers in 2009; and obstructing a peace officer in 2013. The CHS also has prior felony convictions, including, among others, being a felon in possession of a firearm in 2011; bringing a controlled substance into a prison in 2014, 2015, and 2016; grand theft in 2015 and 2016; and assault with a deadly weapon with force in 2016.

4

Skyway Drive, Santa Maria, California.  The CHS told SMPD that HILBRANT was driving a green and white Yamaha motorcycle, and it would be parked at the Radisson if HILBRANT was there.

11.  Following the tip, officers confirmed that HILBRANT had an active warrant for a violation of court supervision and was on probation with search terms, including the requirement to submit his person, property, and vehicles to search and seizure at any time of day or night by a peace officer with or without cause.

12.  On September 9, 2020, a SMPD officer drove by the Radisson hotel and saw a green and white Yamaha motorcycle, matching the description of HILBRANT's reported motorcycle.[3]

13.  Later that day, SMPD officers confirmed with the CHS that HILBRANT was still selling drugs from the Radisson hotel.

14.  At approximately 7:42 p.m., SMPD officers began surveillance at the Radisson hotel.

### B. SMPD Observes HILBRANT at the Radisson, Arrests Him, and Finds Over a Pound of Methamphetamine

15.  At approximately 8:00 p.m., SMPD officers on surveillance identified HILBRANT as the driver and sole occupant of a black Lexus.  Officers saw HILBRANT back the car into a parking stall near the hotel entrance.  Officers then saw HILBRANT exit the car.

16.  Officers approached HILBRANT and arrested him on the outstanding warrant.  At the time of his arrest, HILBRANT was

---

[3] During the week leading up to September 9, 2020, another SMPD officer also saw HILBRANT driving a green and white Yamaha motorcycle.

carrying two "Jack in the Box" restaurant bags. Officers looked inside the "Jack in the Box" restaurant bags and found a plastic bag containing approximately one pound of methamphetamine inside one of the bags.

17. HILBRANT was also in possession of a Radisson room key. After confirming that HILBRANT was a registered guest in room 358 at the Radisson hotel, officers searched HILBRANT's room pursuant to his probation search terms. During the search of the hotel room, officers located four additional separate bags containing approximately one ounce of suspected methamphetamine each, along with a fifth bag containing less than an ounce of methamphetamine. Officers also found a digital scale in the hotel room.

18. Officers also seized other items from HILBRANT, including, among others, five cellphones (the "SUBJECT DEVICES"), drug pipes, a tactical vest, a handwritten bill of sale for the Lexus that HILBRANT was seen driving, and a receipt for Radisson room 358 from dates September 7, 2020 through September 10, 2020 containing the initials "KH."

C. **DEA Testing Confirms the Methamphetamine**

19. Subsequent DEA laboratory testing confirmed that the pound of methamphetamine found in the "Jack in the Box" bag contained approximately 431 grams of pure methamphetamine. DEA testing also confirmed that the small fifth bag of methamphetamine contained approximately 8.2 grams of pure methamphetamine. As of the filing of this complaint, the DEA laboratory has not completed the testing of the four smaller

6

bags which are believed to contain an ounce of methamphetamine each.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

20. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. These records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In

7

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

21.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

22.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

8

after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

9

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally

10

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HILBRANT's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HILBRANT's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

26. For all of the reasons described above, there is probable cause to believe that HILBRANT has committed a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 16th day of
October, 2020.

_____
HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE